**Opinion issued August 27, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00258-CV

———————————

## IN THE INTEREST OF M.M.-Y.P.

———————————

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2014-00702J

———————————

## MEMORANDUM OPINION

S.L.R.'s parental rights to her daughter, M.M.-Y.P., were terminated.[1] In one

issue, she contends that the evidence was factually insufficient to support the trial

court's finding that termination was in her daughter's best interest. We affirm.

---

[1]     The mother, S.L.R., will be referred to as "Mother," and the child, M.M.-Y.P., will
        be referred to by the pseudonym "Mary," both to protect their privacy and for ease
        of reading.

## Background

Mother tested positive for cocaine when she gave birth to Mary in December 2013, at the age of 28. Initially, she told the investigator that she had applied cocaine to her tooth to relieve a toothache, but she later recanted and explained that she had been "handling" cocaine without wearing gloves. The Department of Family and Protective Services initiated a Parent Child Safety Placement, and Mary was placed with friends of Mother's choosing directly from the hospital. About one week later, Mother submitted to a urine drug test and tested negative for all drugs.

Conflicts quickly developed between Mother and the people she chose to care for Mary under the safety plan. At one point, Mother threatened to take Mary away from the caregivers' home and go to Louisiana. Conflicts continued. Six weeks after her birth, in February 2014, Mary was removed from the caregivers' home, at their request, and placed in foster care.

DFPS filed an original petition for conservatorship and termination of parental rights, accompanied by a supporting affidavit from Wynona Chevalier, a DFPS caseworker. Chevalier averred that efforts had been made to eliminate the need for removal of the child but that it was in the child's best interest that DFPS be named temporary sole managing conservator. DFPS was named temporary conservator. A full adversarial hearing was held February 20, 2014. DFPS

remained temporary sole managing conservator and Mother was denied any visitation until she "test[ed] negative in [her] . . . drug tests."

A Family Service Plan was created in March 2014 that placed numerous requirements on Mother. To fully comply with the plan, she was required to (1) complete a psychiatric evaluation and follow all of the evaluator's recommendations; (2) complete a psychosocial assessment and follow all recommendations; (3) maintain a lifestyle free of drugs and alcohol, complete a drug and alcohol assessment, and follow all recommendations; (4) maintain a working telephone; (5) complete a multi-week parenting class and demonstrate learned behavior during monitored family visits; (6) abstain from criminal conduct; (7) attend twice-monthly visits with her daughter; (8) comply with all court orders and actively participate in all proceedings; (9) maintain suitable housing that is "clean, stable, and free from safety hazards for a period of six consecutive months"; (10) complete random urine drug tests; (11) establish educational and employment goals and demonstrate financial responsibility; (12) engage in individual and family therapy; and complete other, less specific requirements. The plan specified a permanency "goal" of "family reunification."

The plan detailed several of Mother's "strengths," including that she is a "good mother," has a "clean home," "attends college," "is caring" and "ambitious," "has her own transportation" and "housing," and "appears concerned about her

3

child." She was described as "cooperative" with DFPS. The plan also stated that "[t]here is no doubt that she loves her child but she could benefit from parenting classes and therapy." The plan expressed concern over Mother's drug use during her pregnancy. The plan also stated concerns about Mary's father's past family violence, drug use, and noncompliance with his own Family Service Plan and, in particular, that there were various indications that he might be living in Mother's home.

At the termination trial, held just less than one year after Mary came under DFPS's care, a DFPS caseworker, S. Easley, testified about Mother's compliance with the plan. She stated that Mother had completed the psychiatric, psychosocial, and substance-abuse assessments and attended therapy. She also attended the scheduled visits with Mary. Easley described Mother's interaction at those visits as "appropriate" and noted that Mother would bring "supplies" for Mary. Easley stated that both mother and daughter demonstrated a bond. Easley agreed that Mother had provided bank statements and some proof of income but stated that her documentation was insufficient to adequately verify her income to establish financial responsibility. She also listed two concerns regarding Mother's home: (1) there was "male clothing" in the home and (2) the home was "less than clean" and "not as sanitary as it could have been."

In the end, Easley agreed that Mother had completed all of her plan's requirements except one: there was evidence that Mother had not maintained a drug-free lifestyle. Specifically, she failed four drug tests between February and November of 2014, all while Mary was under DFPS care. These tests revealed that

1. on February 20, she tested positive for cocaine at 4,212 ng/mL in a urine test and at 16,380 pg/mg in a hair follicle test;

2. on April 15, she tested negative for all tested drugs in a urine test but positive for cocaine (at over 20,000 pg/mg) and marijuana in a hair follicle test;

3. on July 22, she tested negative for all tested drugs in a urine test but positive for cocaine in a hair follicle test in the amounts of 3,788 and 5,799 pg/mg; and

4. finally, on November 6, she tested positive for cocaine again on a hair follicle test at 3,064 pg/mg.

The State proffered Bruce Jeffries as an expert witness. The parties stipulated to Jefferies's "expertise in drug test." He testified that hair testing "goes back 90 days." According to Jeffries, because the November 2014 failed test occurred more than 90 days after the earlier tests, the result could not have been from "the same usage." [2]

---

[2] Mother characterizes Jefferies's testimony as "nonsensical"; however, in context, we view his testimony as unambiguously confirming that a failed drug test would not represent drug usage that occurred more than three months earlier. Mother asked and he responded as follows:

Attorney: Based on reviewing of the November test and the July test, have the numbers gone down for the Mother?

Jefferies: Looks like they stayed about the same, 3,064 versus 3,788.

Mother admitted that she used drugs before her daughter was born and as late as March 2014; however, she denied using drugs after March 2014 and suggested that the hair follicle tests taken after that time period were still showing positive results from drug use months earlier.

Easley testified that Mary was currently in a two-parent foster home. She stated that the foster parents wished to adopt the girl. Yet, she could not answer whether there were any other children in the home or even "what . . . the parents do." Nonetheless, she testified that Mary was healthy and doing "very well" in the foster home. In Easley's opinion, termination of Mother's parental rights was in Mary's best interest.

The judge signed a final decree of termination in February 2015. The decree states that the trial court, acting as factfinder following Mother's waiver of a jury trial, found by clear and convincing evidence that Mother had engaged in various predicate acts for termination, including knowingly placing or allowing Mary to be

---

| Attorney: | Is it possible that it's the same usage on the—that's showing up on both tests? |
|---|---|
| Jefferies: | We went back 90 days, this is roughly four months. |
| Attorney: | And if she tested positive for higher amounts in April, could that possibly be the same usage if there was usage in April? |
| Jefferies: | That would be going back seven months, *so no*, it'd be—it'd be old usage. It wouldn't have any residual effect. |
| Attorney: | Pass the witness. |

placed in conditions or surroundings that endanger her physical or emotion well-being (TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West 2015)); engaging in conduct or knowingly placing Mary with persons who engage in conduct that endangers her physical or emotional well-being (*Id.* § 161.001(b)(1)(E)); failing to comply with court-ordered provisions that specifically establish actions necessary to regain custody of Mary after removal for abuse or neglect (*Id.* § 161.001(b)(1)(O)); and using a controlled substance in a manner that endangered Mary's health or safety and continuing to abuse a controlled substance even after completing a court-ordered substance-abuse treatment program (*Id.* § 161.001(b)(1)(P). The trial court further found, by clear and convincing evidence, that it would be in Mary's best interest to terminate Mother's parental rights. Mother timely appealed.[3]

In her appeal, Mother does not challenge the legal or factual sufficiency of the trial court's finding, by clear and convincing evidence, that she engaged in one or more predicate acts for termination. She concedes that there was sufficient evidence to support a Section 161.001(b)(1)(E) finding that she engaged in conduct that endangered Mary's physical or emotional well-being due to the evidence of

---

[3] The order also terminated the father's parental rights; he did not appeal the judgment.

failed drug tests at Mary's birth and over the next several months.[4] Instead, her single challenge is to the factual sufficiency of the evidence supporting the trial court's determination that it is in Mary's best interest to have Mother's parental rights terminated.

## Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 2159 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, termination proceedings are strictly scrutinized, and involuntary-termination statutes are strictly construed in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Nonetheless, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*,

---

[4]     Mother states, correctly, that only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because she concedes the Subsection (E) finding, she does not address any of the other three findings in her appellate brief.

8

113 S.W.3d at 361 (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that parents may forfeit their parental rights by their acts or omissions, courts' primary focus in a termination suit is the protection of the child's best interest. *Id.*

In a case to terminate parental rights under Section 161.001 of the Family Code, DFPS must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West 2015). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2015); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. Here, the trial court based the termination of Mother's parental rights on the predicate grounds of endangerment, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), and three others.

## Standard of Review

In conducting a factual-sufficiency review, we must determine whether, considering the entire record including evidence both supporting and contradicting

9

the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266; *In re H.R.M.*, 209 S.W.3d at 108.

### Best Interest of the Child

Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in Mary's best interest. In determining whether termination of parental rights was in a child's best interest, we consider several non-exclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interest of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that

may indicate that the parent-child relationship is improper, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

DFPS is not required to prove that all of these factors support termination of parental rights, and the absence of evidence on some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under Section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See id.* at 28.

## A.    Child's desires and plans for the child

At the time of trial, Mary was 13 months old. She had been under another's care, and not her mother's, since the day she was born. Nonetheless, there was evidence that Mother's visits with Mary went well and that the two had developed a bond. Given Mary's young age, this factor considering the child's "desires" results in a neutral finding. *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Regarding the competing plans for the child, the evidence indicated that Mother had an adequate home at the time of trial and planned for Mary to live there with a room of her own. Mother is a full-time student and works part-time for

11

staffing agencies while receiving additional income by working from home "do[ing] hair."

Mother asserts that the evidence was deficient regarding the foster parents' plans for Mary. By example, she alleges that there was no evidence of the foster parents' ages, health, fostering experience, home size, or plans for home childcare or daycare. The caseworker testified that the foster parents' home was "very stable," they owned a real estate business and the woman worked "out of the home," and they have two adult children who are successfully employed and living in other states. According to the caseworker, the foster parents wanted to adopt Mary, and the caseworker supported that outcome. With positive evidence supporting both Mother and the foster parents, this sixth *Holley* factor is neutral.

## B. Needs of the child, mother's parenting abilities, available assistance, and stability of the home

The second factor considers the current and future physical and emotional needs of the child, the fourth factor considers the parental abilities of the person seeking custody, and the fifth factor considers whether programs are available to assist the person seeking custody. *In re A.S.*, No. 01-14-00113-CV, 2014 WL 3779022, at *9–10 (Tex. App.—Houston [1st Dist.] July 31, 2014, pet. denied) (mem. op.). There was evidence that during her visits with her daughter, Mother was engaged and acted appropriately. Mother brought supplies for Mary and demonstrated positive parental skills. However, there also was evidence of

12

continued, failed drug tests. Drug use can negatively affect one's parenting abilities and may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

A parent's drug use can also indicate instability in the home environment, which is the seventh *Holley* factor. *See P.W. v. Dep't of Family and Protective Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.); *In re G.A.*, No. 01–11–00565–CV, 2012 WL 1068630, at *6 (Tex. App.— Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) (citing *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ)).

Regarding the fifth factor, there was evidence that programs had been made available to Mother and she had used many of them, in compliance with her plan, but there was no evidence about specific programs that could be available to Mother in the future. The evidence of Mother's past compliance suggests that she would be receptive to future programs. Nonetheless, and despite completion of a drug-related program, Mother continued to use drugs and failed multiple drug tests.

On balance, these factors weigh in favor of termination.

## C.    Physical danger to the child and parental acts or omissions

The third factor is the current and future physical danger to the child. *Holley*, 544 S.W.2d at 371–72.  The evidence showed that Mother continued to test

positive for cocaine almost a full year after Mary was removed from her care. While Mother denied any drug use after March 2014, Jeffries testified that the November 2014 drug test indicated use within the preceding 90 days, and, if believed, would have discredited Mother's testimony. Drug use by a parent has been recognized to weigh against the parent in the "physical danger to the child" factor. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Finally, we consider the eighth and ninth factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses for them. *Holley*, 544 S.W.2d at 372. When Mother tested positive for cocaine at the hospital when Mary was born, she denied any drug use. When she tested positive again, she admitted that she used drugs before Mary was born and during the first two months Mary was under DFPS's care. She denied using drugs after March 2014. Jeffries's testimony and the drug test results admitted into evidence supported the conclusion that Mother continued to use drugs even after she claimed to have stopped.

DFPS also raised an issue at trial whether Mother was continuing to live with Mary's father, who had been uncooperative with the DFPS's efforts to obtain drug test results from him or to enter into a family plan. When he did submit to a

14

drug test, it revealed marijuana and cocaine use. Further, there was evidence of past domestic violence by him against Mother.

While Mother denied that she continued to live with the father, the caseworker expressed concern because men's clothing had been observed in Mother's home, the father was still listed on Mother's lease, and Mother had admitted at least once that he continued to live with her. This evidence weighs in favor of termination. *See In re D.J.*, No. 02-11-00367-CV, 2012 WL 2135579, at *8 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.) (terminating parental rights of mother who continued to use drugs, continued relationship with father who had history of domestic violence against mother, and renewed lease to continue to live with him despite elevated risk this posed to child).

The judge as factfinder is tasked with resolving factual disputes and making determinations regarding witness credibility. *See In re A.S.*, 2014 WL 3779022, at *10. Evidence that Mother continued using drugs and living with Mary's father, who had a history of violence, noncooperation with the DFPS, and failed drug tests, if accepted, indicate acts and omissions by Mother that weigh in favor of termination. *See In re C.R.M.*, No. 01-14-00219-CV, 2014 WL 4115945, at *9 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014, no pet.) (mem. op.). Accordingly, these factors support termination.

Viewing all of the evidence, disputed and undisputed, it is sufficient to produce a firm belief or conviction that termination of Mother's parental rights was in Mary's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. And the disputed evidence is not such that a reasonable factfinder could not have resolved it in favor of the finding that termination was in Mary's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *J.F.C.*, 96 S.W.3d at 265–67. Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of Mother's parental rights was in Mary's best interest.

## Conclusion

We overrule Mother's sole issue and affirm the judgment of the trial court.



Harvey Brown
Justice

Panel consists of Justices Jennings, Higley, and Brown.

16